We're happy to hear your argument in our third case, Grayson O Company v. Agadir International. Agadir. Good morning. May it please the court. We're here this morning asking the court to reverse the district court order which granted summary judgment to the trademark infringer, Agadir, and denied summary judgment to the trademark owner, Grayson O. The district court's order turns this court's trademark and Lanham Act jurisprudence on its head. Indeed, it undermines the foundations of the Lanham Act itself, and I submit to you that the district court got the law exactly wrong on several points. First, it's a black-letter law that a side-by-side comparison of the marks is not the test. This court has said that repeatedly in cases such as Synergistic, P3 of Uno, and Whataburger. And that's lucky for you, isn't it? Yes. In fact, every circuit court in the country has said that for nearly 100 years. When you look at the side-by-side pictures, though, on page 225 of the appendix. I say it's lucky for you. It's not the test. It would only be the test if they were, in fact, sold side-by-side in the marketplace, like you might see Cheerios beside a yellow box of similarly situated cereal. So they don't sell these in the same salons? They aren't competitors? They are direct competitors, but there's evidence that they were never sold side-by-side in the same salon. And why is that? Because there's different distributors that may sell. You pick one or the other. You're going to get everything from this distributor or everything from another. That's right. Also, they're essentially the same product of the same quality. So it wouldn't make sense for a stylist to try to have two different products on the shelf and try to sell. They sell these to their clients. So they're not going to stand up there and say, well, here, we've got two different ones. You pick. The stylist is going to. Which is what every other retailer does. I don't buy my shampoo at a stylist. I buy it from the grocery store. So I try this one. If I don't like it, I'll come back and try a different one. I ain't got enough hair to go to a stylist. What's that? I don't have enough hair to go to a stylist. Oh, you underrate yourself. So can I ask you about your mark? Your registered mark is capital F450, right? That's correct. That is the registration. Okay. And there's a space between the F and the 450? Yes, Your Honor, that's correct. And there's no degree sign, right? The registration does not have a degree sign. Okay. But in the market, you use a mark with a lowercase F, no space, and the number 450 with a degree sign. Well, in the market, we use a stylized form. So whether there's a space. But just to answer my question, is that correct? It's correct. There is a degree sign. The space, I'm not so sure since it's stylized. So you think there is a space? I mean, they're not putted directly there. It's a stylization. It's a lowercase F? Yes. But so this is a standard character mark. And there's a degree sign? There is a degree sign. So this is a standard character mark. And it was registered. Then how much weight do we give your registration? This court has said explicitly in the synergistic case that it is giving a broad degree. A broad degree of what? It's got the exact quote. Well, let me ask you this. So a professional is speaking to a client, right? I'm sorry. I just found the quote, Your Honor, for your other question. The PTO's registration of a suggestive mark should be broadly construed. That's synergistic. I don't understand exactly how that relates here. But okay, so you're in the salon. And your hairdresser is talking to you about this product. Does he refer to it as F450? Fahrenheit 450? Term of use F450? I would submit it would be 450. Well, there are so many things that have 450 on them. Not in the hair care industry. Not in where products are sold exclusively in salons. There are not products that have 450 on them. But you didn't trademark 450 alone? F450 is the trademark registration. With a space between? And a capital F? As it appears on the bottle, yes. I'll give you some examples. So in this court, in synergistics, the marks were windshield doctor and glass doctor. Now, they had a trademark on that. But the court said you only look at the dominant portion of the mark, not the descriptive portion of the mark. And this court focused on doctor, not windshield, not glass, doctor. And so I would suggest that in this case, the court should focus on 450. Not the F, not the hair shield, just 450. Could you have trademarked 450? We did not try to do that. Would that be possible? I assume so. There's plenty of numbers that are trademarked. So it's black-letter law that a side-by-side comparison is not the test. I said that earlier. I think the case should be reversed for that reason alone. Second, this court has said that you only focus on the dominant words in the trademark. The district court went through the nine factors, right? The district court did go through the nine factors. So why would we reverse on that basis alone? Because the two do look alike. We should reverse? Yeah, well, they should. If you had compared them in light of the marketplace instead of the side-by-side comparison, I submit you'd have a different result entirely. Did the district court say he was doing a side-by-side comparison? He did. He pasted the images side-by-side. He went through and compared the shapes of the bottles, the coloring that appears on the bottles. Did he say that I'm relying on this and I'm not going through the nine factors as I'm properly told to do? No, he went through the nine factors. Right. So why don't you tell us where he made an error in your view with the nine factors? Did he make a mistake on one? There's several of them. So I think the similarity of the marks factors was a huge one. To put hair shield as the dominant word as part of Agadir's mark was a huge mistake. Hair shield can only be descriptive of a product that shields hair, which is exactly what this does. These products are engineered to protect hair from the intense heat of hair irons and blow dryers. And so hair shield is a descriptive term. So if you take away hair shield, I think you're left with 450 exclusively. And so say I do shopping online. All these Agadir products have got hair shield 450. They're always together. There's no hair shield doesn't show up anywhere in your client's stuff. That's right, because hair shield is descriptive. So it wouldn't show up. That's a descriptive term. It doesn't form a part of the trademark. So when we look at this second factor, similarity of the two marks, is that what you're talking about? Yes, ma'am. We have to, if there are two, if there is a part of each of these things that are similar, then that means that you win. Right. That's exactly what this court has said, the dominant portion of the mark. That's the salient piece that the purchasing public remembers when they see a product. Even though that isn't what you registered. You didn't register 450. You registered capital F space 450. Now, that's correct. Now, if they had used capital F space 450. That's not the trademark law with all due respect. This court has said you focus on the dominant portion of the mark. But you're telling us what you think is the dominant portion. I mean, that can't be the fact that just someone who is challenging gets to decide what the dominant portion is. The court decides, right? Absolutely, the court decides. And it's a matter of law. That's why I submit that the court got the law exactly wrong on that point. But that wasn't the only place the court went off the rails. We had significant evidence of intent that Agadir intentionally infringed the mark. We sent them a cease and desist letter. And this was before they ever had a sale in commerce. A cease and desist letter pointing out our position. They responded to it. And then two weeks after their response letter, they sent a direction to their design team saying, let's increase the size of hair shield 450 on our bottles. Maybe that was to make them stand out to differentiate them from the others. Well, again, I would say no. Why does that show some intent to infringe? Because hair shield is descriptive. And this court has said repeatedly that a descriptive portion cannot form a part of the dominant words in the mark. So hair shield is descriptive. Here's a hypothetical. Let's say the Whataburger case of Virginia. What if I had come along and said, well, this isn't Whataburger. This is Tasty Whataburger. I stick a descriptive word in front of the registration for Whataburger. All of a sudden now I can proceed and infringe the Whataburger trademark. This court has been clear that we have to focus only on the dominant words. And hair shield is descriptive of a product which shields hair from heat. Let me, having admittedly been unfamiliar with hairstylists, I'm curious as to how this works. If I go in a salon, there's one distributor's products and one alum. There's no choice, whatever that distributor sells. Now, do people go into a hairstylist just to buy hair products as opposed to going in to get a haircut and then buy while they're there? Well, I think most often they'll go in to get a haircut or a hairstyle, and they'll apply a product to them while they're in there. And then they'll say, oh, didn't you like that? Here's this product for sale. And then the next time you may go back, you may not be getting your haircut, but you'll buy that product. It's a bigger markup. It's a big source of money for them. Well, then how would a consumer, presuming the person getting the haircut is a consumer, ever going to have a choice? So you go to a different stylist. You go to this stylist. Do you think they go to another stylist because of the products? No, but they could go to the next stylist and say, you know, I've used this 450 product before. Do you have any? It's like, oh, yeah, we've got some right here. Here, it says right on the label, 450. So this would – And you don't have any evidence of that? No, we – You have no evidence of that? No, we have evidence of – Oh, no, no, no, no. That's at the fair. That's where they're all principals coming around. All people that are – Right, no, that's correct. Yes, we don't have – We don't have any customers. We have – I mean, there's two different levels of consumers. There's the consumers that buy it for their salons, and then there's the end-level consumers that buy it. All right, so what's your evidence that either of those levels has confusion? Oh, we've got significant. There were over 20 examples at the very first fair of individuals that were confused. But I thought the people at the fair knew the difference. Exactly. That's why they came down. That's the way they expressed their confusion, but confusion isn't always expressed – We're expressing non-confusion. Somebody is violating your trademark is what they're saying. That's exactly what they said. But they knew it wasn't yours, so they weren't confused. I disagree. I think that – it's very rare, and there's cases on this that's in our brief. It's very rare to have a situation where you've got these competing products and identify confusion the way we would discuss confusion in a court. The way individuals are confused often does not filter up to the level where we would even recognize it. All right, well, let me ask it this way. Is there any evidence of the end consumer, the person actually getting their hair cut, being confused between these two products? We have not found any of that. But that is not a dispositive issue. Okay, okay. But other than the folks that were at this hair care fair, is there any evidence in the marketplace of salon operators being confused in their ordering of products? Not that we've identified. All right. Well, again, as I understand it, a salon operator, if you view them as the consumer, they don't have a choice. Whatever the salon's product is, distributor is, the person they've chosen to distribute, that's what they're going to get. They can't get both. They can only get one. Well, I mean, they could get both. But, yeah, typically, no, they would procure just the one product, right? That's correct. Thank you. Good afternoon, Your Honor. Good afternoon. If it may please the Court, I'm Jesus Cousin on behalf of APLE, the defendant in the case, Agadir International. Your Honor, we respectfully request that the district court's opinion be confirmed because what the district court did was nothing more than follow a well-established Fourth Circuit precedent. In 2006, in George, this court specifically suggested that if four specific factors out of the nine factors mentioned during brother counsel's argument are found to be in favor of the defendant, it is appropriate to issue summary judgment in favor of the defendant. Those factors of the nine list factors are factors one, two, six, and seven. Factor one has to do with the strength of the mark. Factor two has to do with the similarities of the marks to the consumer, and this is important because it's all about the public face of the mark. It's about the appearance to the consumers. How do the consumers see the mark? That's factor two. Factor six is intent, predatory intent, and factor seven is actual confusion. In this particular case, Your Honor, this case is stronger than George for Agadir. Why? Because not only do those four factors favor Agadir, but there's a fifth factor, which is factor nine, the sophistication of the consuming public. In this particular case, the district court did find that that last factor, factor nine, applied to this case and did favor Agadir. If we go back to each of the four factors, Your Honor, it's actually, I think the district court identified them as both. I think what the district court identified them as, number one, the professional stylist in the salon, part of the consumer, and then those that purchased from the professional stylist and the salon, another part of the consumer. Importantly enough, with regards to that particular point. I think you're a little too close to the microphone. Yes, Your Honor. There you go. With regards to that particular point, Your Honor, with regards to factor nine, what the court did find, and this is actually, to a certain extent, conceded in appellant's brief, is that the professional stylists are experts on the product. So here what you have is the consuming public, the first group are the stylists, which are conceded by the appellant. They are experts on the product. And then the second group of consumer public, if you will, are the public that purchases this high-end product, but purchases it with the help of the experts of the product. And that part, Your Honor, the part that the consuming public, that's purchasing from the salon, purchases with the help of these experts, is actually conceded in the reply brief as well of the appellant. So that ninth factor, which didn't exist in George, applies here. This case is stronger than George. If we go back to the four factors that George did apply, factor number one is the strength of the mark. The court found that the mark F450 is weak. Not only did the court find that it was commercially weak, the court did suggest, and I think it actually did find, that it was conceptually weak as well. When you're looking at the strength of the mark, you're looking at both conceptual strength and you're looking at commercial strength. The court started with conceptual strength. And the court stated, and we agreed for purposes of the motion for summary judgment, that F450 is suggestive. But the court also went on to say, consistent with Fourth Circuit precedent, for example, Care First and the Petro case, consistent with Fourth Circuit precedent, the court said, you also have to look at use of the mark by third parties. And in this particular case, there is no question that there is extensive use of, at a very minimum, the 450. In the hair industry and outside the hair industry. In the district court's opinion, in the summary judgment issued by the district court, the district court makes reference to the record and states that there are more than 20 examples that were submitted by my client where manufacturers of hair-related products used the 450 in their mark. How do you define your mark? Is it suggestive? Your Honor, we defined our mark as, well, let's go back to what's the dominant portion first. For us, it's, well, the entire mark is Agadir Argan Oil, hair shield 450 plus. There's no question that the dominant portion is hair shield 450. Your Honor, we didn't really get into whether our particular mark was suggestive or wasn't suggestive. Below the issue was really is the 450 suggestive or not suggestive. I don't, at this particular point in time, I don't know how to respond to your question only because we really haven't focused on whether our particular mark is suggestive or it isn't suggestive. What we have done is we've focused on the different factors mentioned in George. Sorry, this is a good time for me to interrupt you. Go ahead. I want to ask you a question with regard to factor six, which is whether or not there's predatory intent on the part of the alleged infringer. After you got the cease and desist letter, your client instructed whoever is doing the designing to increase the font size, I think, by 10%. Yes, Your Honor. Of course, you give a reason why that was done. They may or may not accept that reason. If they don't accept it, why didn't that create a factual dispute that would require a jury trial to resolve it? Your Honor, because the issue here is what was the intent at the time that the mark was selected? The mark was selected before we received the cease and desist letter. But you increased the size after. Yes, Your Honor, but that goes to the issue of knowledge of their mark, which are two different issues, right? Going back, the issue that's relevant here is why was the mark selected? Did we have the intent to benefit from their mark? Did we have the intent to confuse the public in making them believe that our product is related to their product? In this particular case, Your Honor, it's impossible for that intent to exist. Why? Because we selected the mark before we even knew about their product. Now, let me address, Your Honor, your question. There's no question that at the time that we provide the instructions to increase the fund by 10%, there's no question that at that particular point in time we had received the cease and desist letter. But there's also no question that the Fourth Circuit has mentioned clearly that knowledge is not the same of predatory intent. So let's look at the Swatch cases, the 2014 case. No, I don't think you need to look at cases. Why isn't it just a factual dispute as to whether or not you're intending to capitalize on their use? Your Honor, because there is absolutely we selected the mark before we received the letter. Let me tell you what's not in the record. There is no suggestion. Don't tell me something's not in the record. No, no, no, but it's relevant to your question, Your Honor. I don't care if it's relevant or not. It's not in the record. I'm not going to consider it. Your Honor, so let's talk about what's in the record. The only thing that's in the record is you have two facts. You have a fact that we received the letter and you have an independent fact that we increased the fund of our mark. Your Honor, you don't have any connection between You increased Hare Shield 450, the whole thing. Yes, Your Honor. Yes, both. We increased Hare Shield 450. All written out. Yes, by 10%. But what there isn't, again, there is nothing in the record to suggest that one thing had to do with the other. There's not even But can't the jury draw a logical conclusion? Well, Your Honor, I think that at a very minimum, you have to have evidence at a very minimum. You have to have evidence that the people that were dealing with increasing the 10% at a very minimum had knowledge of the letter. That type of evidence is not part of this record. The only thing that you have in this record, Your Honor, is they sent the letter and then afterward we increased the mark by 10%, and specifically Hare Shield 450. But there's absolutely no evidence that the people responsible for increasing the mark by 10% had knowledge, or why is it that they did it? And again, Your Honor, I know that I've already mentioned this, but respectfully, Your Honor, the issue of what we do once we have knowledge is not relevant unless it shows that it was our intent to benefit from their mark. A reasonable inference to that effect can be drawn. Absolutely, Your Honor. But remember, in this particular case, you have a weak mark. They don't have a lot of sales. My client has been in the industry for many, many, many years. My client who's in the industry didn't even know about their product. So I hear what you're saying, Your Honor, but my mind keeps going back to the record. And respectfully, Your Honor, I don't think that there's any evidence in the record that would support that one can make a reasonable inference that my client tried to benefit from their mark when they increased the 10%. We view the testimony and evidence in the light most favorable to the non-moving party and give them the benefit of all reasonable inferences. And so that was my question. If we do that, looking at this factor alone, why doesn't that at least create a jury trial in this particular case? Your Honor, because I think, again, the test is why did we select the mark. That's the question. Why did we select the mark? You may say that this factor is a minor factor even when you do that. It's still outweighed by the evidence regarding the mark. Your Honor, I'm not saying that it's certainly a factor. And I'm not saying that it's a minor or a major factor. But what I am saying is- Are you contending that the other factors, the factors that are in your favor, would outweigh it if we should conclude that there is a dispute of material factors to it? Are you saying that? Your Honor, I think that when you do the analysis, and the analysis is a legal analysis,  I think that the record clearly supports the court's decision below. Well, why don't you tell us which of these other factors the district court decided are the winners for you and why the district court was correct. Your Honor, number one, there's no question that the strength of the mark, the mark is definitely weak. It's weak from a conceptual point of view, and it's weak from a commercial point of view. Again, from a conceptual point of view, Your Honor, the parties have agreed that it's suggestive. There's no question that there's more than sufficient evidence of third-party uses, and the Fourth Circuit has made very clear that they're third-party uses. A weak mark is one where you do have third-party uses. A strong mark is one where you don't have third-party uses. CARE first made that comment. The Petro case made that comment. And if you go back even to Pizzeria One, which is a 1984 case, in Pizzeria Uno, I'm sorry, the court actually examined whether the mark Uno had been used before. And because the mark Uno had not been used and not been frequently used by third parties, in that particular case, the court ruled the way that it ruled. In terms of commercial weakness, Your Honor, if you look at the – to determine if a mark is commercially weak, there are seven other factors, right? You look at advertising. Their advertising in five years was $200,000. Compare that to the Petro case. It was $6.2 million in the same amount of time. Still, the court ruled that the mark was weak in Petro. If you look at sales, Your Honor, the sales of this particular product in five years is 60,000 bottles, if you will. In the George case, it was 500,000 per year. Still, in George, the court ruled that George's mark was weak. There wasn't any marketing studies, Your Honor, that would link F-450 to Grace Uno, which is one of the factors that is considered by George when you're trying to determine commercial weakness. Okay, you've done the strength of the mark. Now what about similarity of the two marks? Your Honor, again, similarity? Another fact. For me, after reading the cases, for me, it's pretty much a three-step process. And what you're really looking at, and the court actually alluded to this, what you're really looking at is, again, it's the public face. It's the appearance to the public. You look at the product. You first determine what are the dominant portions of the mark. In their particular case, there's no question that it's F-450, not 450. In our particular case, it's hair shield 450. But you just don't stop there. You actually have to look at, which in my mind is step two, is how is it that these marks, that the dominant marks, are actually presented to the public? That's why you have to look at the bottle. That's why you have to look at the print. That's why you have to look at the font. That's why you have to look at the other words that actually appear on each product. In this particular case, the word Agadir, which is the source of my client's product, is the first word that actually appears in the bottle. My client is not trying to take advantage or suggest that my client's product is a grace on our product. It's impossible. My client's product starts with the word Agadir. My client is proud of its product, and my client, in its product, in the label of its product, specifically says what is the source of the product. When you look at both products, when you look at them as they appear to the consumer, and this is important, the products are dissimilar to the eye. The products are dissimilar to the ear. It's not the same thing to say F450 and then hair shield 450. And the meaning of both products are actually different as well. In Grayson Oh's case, the president of the company testified that the F stands for formula. So the meaning of F450 for them is formula 450. In our case, our product is hair shield 450. The message is clear. This product is to protect the consumer, to shield the consumer from heat in irons, if you will, all the way up to 450. So there's no question, Your Honor, respectfully, that the district court got correct. Okay, those are two factors. But JGS, you go through them all, and you're taking so long on two. All right. Tell us a little bit about confusion. So in terms of actual confusion, what you have here is you have a trade show that took place in 2012, and the testimony is that what happened in the 2012 trade show happened again afterwards. So look at what happens. Agadir is there. Grayson Oh is there. In addition to that, you actually have the consumer. The professional stylists are there. The professional stylists, they go up to Grayson Oh, according to their testimony, which we have to take as truth. They go up to Grayson Oh, and they tell him, someone else is using 450. Now, we will stipulate that in our client's mark, the text 450 appears. But in that statement of someone else is using 450, there is no confusion. You cannot label that actual confusion. To the contrary, you are identifying someone else as the source of the entity, if you will, that's using the other 450. Now, look at what, again, this happens on a yearly basis, according to their testimony. The trade shows happened in 2012, 2013, and so forth. Look what was never said by these professional stylists that used the product. They never said, I purchased an Agadir product thinking that it was your product. I used an Agadir product thinking it was your product. It goes further than that. Look at what they also never said. A customer came to me and told me that he or she purchased an Agadir product thinking that it was your product. Or a customer came to me and told me that they used an Agadir product thinking it was your product. Thank you, Your Honor. Thank you very much. Mr. Long, do you have a rebuttal? I'd like to touch on a few topics that my good friend, Mr. Kousa, raised. First, with these third-party uses that he cited, there is absolutely no context for those usage in the record. There is no evidence that any of those products were ever sold to the public. In many cases, they were applications filed on an intent-to-use basis. And then they later went abandoned. And most of these were filed, the applications were filed well after Grayson O began using the mark. So to say that the field is crowded with 450, these are all events that took place after we started using it. And we're actually well within our statute of limitations to challenge most of those uses. So if you want to know more about that, I'd point you to Documentary 57, which is our opposition to Agadir's summary judgment motion, where we break down each one of those uses and explain why they're irrelevant to the case here. But I'd like to take a step back a second and look at the broader picture. The Supreme Court in this case, the Supreme Court said in Marbury v. Madison, that a right without a remedy is no right. Here the parties don't dispute that Grayson O has a valid United States trademark registration and has used it continuously in commerce. Grayson O has a vested statutory and common law trademark rights in the F450 mark. After Grayson O secured its registration, Agadir placed a purely descriptive term, hair shield, in front of 450 and directly competed with Grayson O, selling the same products of the same quality to the same consumers in the same channels of trade and using the same forms of advertising. None of these facts are in dispute. Does the record tell us that Agadir did not exist before Grayson O? The 450, their hair shield 450 product did not exist. Did not exist. Right. And where is that found in the record? That would, I'll have to look back. I don't have it in front of me. But I don't think Mr. Kuzal will dispute that it is. It's your submission that they didn't have a 450 on any of their products before this? No, and I think it's in the district court order. We are the senior user. We began using it several years before they did. So I think that the district court order, the way it stands now, sends a chilling signal to all would-be infringers, to all trademark owners, that a would-be infringer, all they need to do to avoid Lanham Act liability, is place a descriptive term in front of an already registered mark. So I believe that this court should reverse the order of the district court and maintain the holdings of Pizzeria Uno, Synergistic, and Whataburger and affirm that a side-by-side comparison is not to test, that descriptive terms can never form a dominant portion of the mark, and that innocent infringement is not a defense of trademark infringement. Tell me how you would describe the sophistication of the consumer. That's a very good question. The consumer who buys the product at the retail level, I would say they're unsophisticated because they're outsourcing their sophistication to the stylist, in a sense. They don't know what they're buying. They're just buying what they're told to buy. The consumer is the ultimate consumer, the person who's actually going to use and apply the product. That's right, and if you look at the case law on this point, I'd point you to the Perini case. That's a Fourth Circuit case that was from 1990. It may have been the first Fourth Circuit case that acknowledged the sophistication of the consumer as a factor, and I think sophistication may be even the wrong word. The court uses their expertise, and the facts in that case were the Army Corps of Engineers were the purchasers, and they were signing contracts with these multimillion-dollar deals to build projects for the Army. At what point are you talking to now? Sophistication of the consumer. For purposes of confusion? Confusion. So I guess what I'm suggesting is that the case law says that sophistication, and this is a very high bar. These are Army Corps of Engineers experts signing deals with contractors. The Perini case identifies a few others. There was a hospital chemistry lab purchasing chemicals, and the court said that these are sophisticated doctors. They're not going to mistake which suppliers are for these chemicals. How is the end user confused? Either I'm lost or you're lost here. Whether the end user is sophisticated or unsophisticated, how are they confused by these two products? Well, I'm suggesting that the end user is not sophisticated. That factor should be neutral, and the court shouldn't have considered it. As far as how they're confused, it's the scenario that I laid out earlier. You walk into one salon and you buy the 450 product, which is actually most likely to happen because we enter the market first. You probably encounter our product first. Then maybe you move to another city, you find a new salon, and you go, I'm really interested in this 450 product. They pull one off the shelf. Instead of a red and pink bottle, it's got a pink and orange bottle. The colors may be slightly different, but that's the one you're going to buy, the one that has the 450 on it. That's the dominant portion of the market the consumer is going to focus on when they're looking at those two products. So the conclusion you arrive at basically by inference, not by actual evidence in the record. That's exactly right. The quality of the product is something we haven't mentioned, but we're stipulated that the products are of the same quality, which actually makes actual confusion that much difficult to discover because the person who has been confused is unlikely to realize the deception. If you bought this alternate 450 at this other salon, you probably don't know you bought the wrong product, and you're not going to know about it. You're not going to go tell your stylist. But even if you did, your stylist is going to say, hey, well, this is the one we're selling. And so it's even less likely that that stylist would report the confusion up the chain. So that's one reason we don't have evidence of actual confusion, and that's one reason the courts have repeatedly said that evidence of actual confusion is not a prerequisite and is not a requirement under the Lanham Act to prove likelihood of confusion. One more point. Again, I'm just trying to understand this. Your publics that you're concerned about consist of those people who change salons and change salons from one that uses one product to another salon Yes, sir. In fact, my wife has changed salons recently. I think this happens. I mean, you may get loyal to one salon and you stick there for a while, but maybe they close. They go out of business. But you don't have any evidence. We don't. We don't have any evidence. And as I said earlier, it's unlikely that you would find evidence, given that the products are of similar quality. And finally, the George case that Mr. Kousa cited too repeatedly, I would say that doesn't apply in this case. There the products were sold side by side, and they were quite different. The stylized marks were left, center, right, and it was LCR. And the sales in that case were grossly different because they were games, had nothing to do with shampoo. Thank you very much. Thank you. We will come down and say hello to the lawyers and then go to our last.
judges: Diana Gribbon Motz, William B. Traxler Jr., G. Steven Agee